# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued October 18, 2024        Decided December 20, 2024

No. 23-1288

STINGRAY PIPELINE COMPANY, L.L.C.,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

———

On Petition for Review of Orders of the
Federal Energy Regulatory Commission

———

*Shemin V. Proctor* argued the cause for petitioner. With her on the briefs were *Kevin Erwin* and *Gia V. Cribbs*.

*Angela X. Gao*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With her on the brief were *Matthew R. Christiansen*, General Counsel, and *Robert H. Solomon*, Solicitor. *John H. Shaner*, Attorney, entered an appearance.

Before: SRINIVASAN, *Chief Judge*, WILKINS and RAO, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* WILKINS.

WILKINS, *Circuit Judge*: Before us is a Petition for Review challenging an order issued by the Federal Energy Regulatory Commission ("FERC" or "the Commission"), which authorized abandonment of a pipeline operated by Petitioner Stingray Pipeline Company LLC ("Stingray"), subject to a condition. *See* Order Authorizing Abandonments and Determining Jurisdictional Status of Facilities, *Stingray Pipeline Co.*, 183 FERC ¶ 61,201 (2023) ("Initial Order"); Order Addressing Arguments Raised on Rehearing, *Stingray Pipeline Co.*, 185 FERC ¶ 61,171 (2023) ("Rehearing Order").

Stingray operates a pipeline system subject to FERC's jurisdiction. As a public utility subject to a certificate of public convenience and necessity, it is required to supply continuous service to its constituents. Beginning in at least 2014, however, a portion of the pipeline began declining in volume (or "throughput"), diminishing revenues while costs remained hefty. Faced with an unprofitable business, Stingray sought to abandon its pipeline by, in relevant part, selling it to an entity outside of FERC's regulatory jurisdiction. Shortly after its application was filed, disaster (literally) struck. A hurricane damaged part of the pipeline, Segment 3394, causing an outage. Stingray assured FERC that it was developing a plan to restore service. Four years later, Segment 3394 remains inoperative.

FERC largely granted the application to abandon the pipeline, but imposed one condition: Stingray either had to restore Segment 3394 to service or reach an agreement with the sole firm shipper whose service was interrupted. On rehearing, Stingray challenged the condition as unreasonable and unsupported by the record. After FERC reaffirmed its order, Stingray petitioned this Court for review. Jurisdiction is proper under 15 U.S.C. § 717r(b). For the following reasons, we deny the Petition for Review.

3

## I.

### A.

"The Natural Gas Act ('NGA') gives FERC 'exclusive jurisdiction over the transportation and sale of natural gas in interstate commerce for resale.'" *Columbia Gulf Transmission v. FERC*, 106 F.4th 1220, 1225 (D.C. Cir. 2024) (quoting *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 300–01 (1988)). "Section 7(e) vests in the Commission control over the conditions under which gas may be initially dedicated to interstate use. . . . [O]nce so dedicated there can be no withdrawal of that supply from continued interstate movement without Commission approval." *Atl. Ref. Co. v. Pub. Serv. Comm'n of State of N.Y.*, 360 U.S. 378, 389 (1959); *see California v. Southland Royalty Co.*, 436 U.S. 519, 526 (1978) ("Th[e] issuance of a certificate of unlimited duration . . . create[s] a federal obligation to serve the interstate market until abandonment authorization ha[s] been obtained.").

A company subject to FERC's jurisdiction who seeks to "abandon all or any portion of its facilities" must request permission from the Commission. 15 U.S.C. § 717f(b); *Sunray Mid-Continent Oil Co. v. Fed. Power Comm'n*, 364 U.S. 137, 141 (1960) (Section 7(b) of the Act "regulates the abandonment by natural-gas companies of their facilities and services subject to the jurisdiction of the Commission."). FERC may only permit abandonment upon a finding "that the available supply of natural gas is depleted to the extent that the continuance of service is unwarranted, or that the present or future public convenience or necessity permit such abandonment." *Sunray Mid-Continent Oil Co.*, 364 U.S. at 142. "The statutory necessity of prior Commission approval,

with its underlying findings, cannot be escaped." *United Gas Pipe Line Co. v. Fed. Power Comm'n*, 385 U.S. 83, 89 (1966).

"The abandonment provision was one aspect of Congress' scheme to protect natural gas consumers from exploitation[.]" *Consol. Edison Co. of New York v. FERC*, 823 F.2d 630, 632 (D.C. Cir. 1987). "The Commission may therefore control both the terms on which a service is provided to the interstate market and the conditions on which it will cease[.]" *Southland Royalty Co.*, 436 U.S. at 524.

**B.**

Stingray operates a 287-mile interstate pipeline system that transports natural gas offshore Louisiana and Texas. In 1974, the then-Federal Power Commission, now FERC, granted Stingray a certificate of public convenience pursuant to 15 U.S.C. § 717f(c). That provision requires a natural gas company to apply for and receive a certificate of public convenience and necessity issued by the Commission before it may construct or extend any natural gas pipeline within FERC's jurisdiction. 15 U.S.C. § 717f(c)(1)(A).

On September 25, 2020, Stingray requested permission from the Commission to abandon by sale part of its pipeline network, known as the West Cameron Block 509 ("WC Block 509") system. Its proposal sought to abandon the relevant pipeline portion by sale to a non-jurisdictional entity, Triton. That system contains a 30-inch pipeline segment known as Segment 3394, which begins at WC Block 509 Platform A and extends about 25 miles. Stingray sought abandonment because it saw a pervasive trend of declining throughput on WC Block 509 between 2014 and 2020. Stingray alleges that the costs to maintain WC Block 509 greatly exceed the revenues generated from this segment. Stingray's initial application sought a shortened procedure pursuant to 18 C.F.R. §§ 385.801 &

385.802, which bypasses a hearing before an Administrative Law Judge, *see id.* § 157.7 (discussing abbreviated abandonment applications).

Shortly thereafter, on October 9, 2020, a platform upstream of Segment 3394 was damaged by Hurricane Delta. Segment 3394 was also damaged. As a result, the segment was taken out of service, which "shut in," or blocked, gas production for two upstream firms: Arena and ERT. On December 14, 2020, Stingray amended its abandonment application. The amendment sought to abandon in place certain damaged portions of the pipeline (i.e., rendering them permanently nonoperational) because they were no longer viable candidates for abandonment by sale. The amended application did not acknowledge the Segment 3394 outage. It also reiterated Stingray's prior request to proceed through a shortened procedure, waiving the right to a hearing. A coalition of exploration and production companies ("Intervenors") protested the amended application, arguing that Stingray had not shown abandonment was in the public convenience, necessity, or interest; alerting the Commission that two shippers were shut in (i.e., without service); and expressing concerns that Stingray would effectively abandon in place Segment 3394 by ignoring the outage.

Stingray dismissed these concerns, clarifying that it did not discuss Segment 3394 in the amended application "because that segment has only been taken out of service temporarily and Stingray is in the process of developing a plan to bring Segment 3394 back into service." J.A. 180. It assured FERC that it would "communicate its plan to bring Segment 3394 back into service in the normal course." J.A. 181. The Commission, in response to these filings, requested "an update on the status of Segment 3394," specifically stating: "If the pipeline is operational, provide the date it was put back into service and

the firm and interruptible throughput . . . of each shipper since that time. If the pipeline is not in service, explain why and the anticipated in-service date." J.A. 247. Stingray responded: "Segment 3394 has not been put back into service. Stingray continues to look at options to develop a plan to put the line back in service. At this time, there is no anticipated in-service date." J.A. 251.

On June 15, 2023, FERC granted Stingray's application for an abandonment order. It concluded that Stingray had shown that present or future public convenience or necessity permitted abandonment, noting that "[t]he disinclination of Stingray's shippers to sign non-discounted contracts for firm transportation service provides a reasonable basis under these circumstances for projecting a lack of growing demand in the future," and thus refusing to "require Stingray to maintain and operate facilities that are not needed to meet the relatively low level of existing firm service obligations and for which there is no demonstration of market demand." J.A. 281. Briefly put, because there was clear evidence of diminishing demand, there was little to no public need for Stingray to continue to operate its pipeline subject to FERC's jurisdiction.

Abandonment, however, was premised on a condition. Because "Stingray state[d] that it [did] not intend to abandon Segment 3394 in place," but it did not provide an "in-service date" prior to abandonment by sale to a non-jurisdictional entity, FERC required Stingray "to either put Segment 3394 back into service prior to abandonment[] or file a statement with the Commission demonstrating ERT accepts Segment 3394 remaining out of service." J.A. 287 (footnote omitted).

On July 17, 2023, Stingray timely sought rehearing of this condition, arguing that Segment 3394 did not need to be included in the amended application because it was only

temporarily out of service and Stingray did not seek to abandon it in place. For the first time, Stingray stated that restoring Segment 3394 to service would cost $7–9 million. This financial burden, it contended, was unjustified in light of the minimal throughput on the system.

On August 17, 2023, the Commission issued a Notice of Denial of Rehearing, and Stingray timely petitioned this Court for review of that order on October 16, 2023. On December 8, 2023, the Commission published an order explaining the reasons for its denial, over a dissent.

**II.**

"The Court reviews FERC orders and actions under the Administrative Procedure Act's arbitrary and capricious standard." *Columbia Gulf Transmission*, 106 F.4th at 1230 (citation omitted). "We will sustain the Commission's decision unless it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *B&J Oil & Gas v. FERC*, 353 F.3d 71, 75 (D.C. Cir. 2004) (quoting 5 U.S.C. § 706(2)(A)). "In making this determination, the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. The court is not empowered to substitute its judgment for that of the agency." *ExxonMobil Gas Mktg. Co. v. FERC*, 297 F.3d 1071, 1083 (D.C. Cir. 2002) (cleaned up). The Court "defer[s] to the agency's expertise so long as its decision is supported by substantial evidence in the record and reached by reasoned decisionmaking, including an examination of the relevant data and a reasoned explanation supported by a stated connection between the facts found and

the choice made." *Turlock Irrigation Dist. v. FERC*, 786 F.3d 18, 25 (D.C. Cir. 2015) (cleaned up).

"The finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive." 15 U.S.C. § 717r(b). "Under the substantial evidence test, the evidence relied upon by the agency must be substantial in light of the whole record." *La. Ass'n of Indep. Producers & Royalty Owners v. FERC*, 958 F.2d 1101, 1115 (D.C. Cir. 1992) (per curiam). "[W]hen agency orders involve complex scientific or technical questions, as here, we are particularly reluctant to interfere with the agency's reasoned judgments." *B&J Oil & Gas*, 353 F.3d at 76.

## A.

The parties disaggregated the issues into whether the condition was supported by substantial record evidence, was consistent with agency precedent, and represented a reasonable balance of competing factors. But these various arguments all boil down to one basic question: Was FERC's decision to condition abandonment in this way arbitrary and capricious based on the record before it? The answer is no.

As the party seeking abandonment, Stingray bore the burden to establish that abandonment without condition was consistent with the public convenience and necessity. As we have summarized, Stingray was required to make "the factual showing which will assure the Commission, charged with protecting the public interest, that that interest will in no way

be disserved." *Mich. Consol. Gas Co. v. Fed. Power Comm'n*, 283 F.2d 204, 214 (D.C. Cir. 1960).

**1.**

Here, the Commission's order imposing the challenged condition was lawful as it reasonably balanced the evidence before it, notably Stingray's repeated representations that it had no intention of abandoning Segment 3394 in place. FERC thus acted reasonably in concluding that abandonment was not consistent with the public convenience and necessity absent the condition.

Stingray's amended abandonment application asserted that abandonment met the statutory requirements because its proposal ensured continuity of service to all reliant shippers. In response to concerns articulated by shippers and the Commission, Stingray represented that Segment 3394 was only temporarily out of service, and that it would be restored to service in the normal course of business. In its Initial Order, FERC expressly relied on Stingray's consistent claim that it would restore Segment 3394 to service, reasoning:

> Stingray states that it does not intend to abandon Segment 3394 in place; however, Segment 3394 is part of the West Cameron 509 System and proposed to be abandoned by sale to Triton. And while Triton may continue to provide service for downstream producers, there is currently no in-service date for Segment 3394. Therefore, Stingray is required to either put Segment 3394 back into service prior to abandonment, or file a statement with the Commission demonstrating ERT accepts Segment 3394 remaining out of service.

J.A. 287 (footnotes omitted). At that point, Stingray had presented no evidence that it was financially infeasible to

repair Segment 3394. While Stingray questioned at oral argument whether it received sufficient notice to require such evidence, it overlooks that Intervenors and the Commission had each requested clarity on Segment 3394's restoration to service, most recently just three months prior to the Initial Decision. Stingray was thus clearly on notice that parties opposing abandonment, as well as the Commission, were considering the Segment 3394 outage. Moreover, had Stingray not waived its rights to a hearing below, it would have received additional notice in that proceeding of both Intervenors' and the Commission's concerns regarding Segment 3394.

On rehearing, Stingray for the first time acknowledged that it sought to abandon Segment 3394 by sale without restoring service. It asserted that it would be financially burdensome for it to do so, asserting that costs to repair would total between $7–9 million. That figure was not supported by further evidence. Notably, Stingray did not submit any evidence of the economic value of continued service through Segment 3394 to the reliant firm shipper, ERT. Instead, it merely presented evidence that ERT makes up a small portion of Segment 3394's overall potential throughput. Such data speak to ERT's value to Stingray, not Segment 3394's value to ERT or to the public generally. Nor did Stingray make any attempt to explain why it could not comply with the alternative to repair set forth by the agency, that is, by reaching an agreement with ERT. And Stingray did not ask to re-open the evidentiary record, as permitted where there are "changes in conditions of fact or of law or by the public interest," as here. 18 C.F.R. § 385.716(c). It merely asked that the condition be removed. The record that Stingray presented to the agency on rehearing thus did not meet its burden to establish that unconditional abandonment was consistent with the public interest. *Tenn. Gas Pipeline Co. v. Fed. Power Comm'n*, 487

F.2d 1189, 1195 (D.C. Cir. 1973) (When faced with a claim "the abandonment d[oes] not meet the 'public interest' standard[] unless conditioned on provision of additional service," "the burden to refute that claim rest[s] on . . . the applicant for abandonment authority.").

Based on the record before it, the Commission reasonably concluded that its condition was justified because Stingray had not shown that abandonment could be approved without the condition. At no stage did Stingray develop a factual record sufficient to allow FERC to find, as it must, that unconditional abandonment was consistent with the public interest. Stingray first failed to even acknowledge the Segment 3394 outage, then submitted financial figures, which still would not allow FERC to assess Stingray's burden relative to harm to ERT or to the public. In its Rehearing Order, FERC emphasized that "[a]n applicant for abandonment under § 7(b) of the NGA has the burden of making the factual showing which will assure the Commission, charged with protecting the public interest, that that interest will in no way be disserved." J.A. 334 (cleaned up). It reasoned that, despite Stingray's representations regarding the expense of repair, Stingray had not carried its burden in light of its prior representations that it would restore service, particularly because it understood the expense required but did not share it with FERC.

The Commission also highlighted Stingray's non-acknowledgment of the alternative portion of the condition, inviting Stingray to "file a statement demonstrating that its firm shipper, ERT, accepts Segment 3394 remaining out of service." J.A. 339. Stingray has not submitted such a statement, nor has it (at any stage of proceedings) presented

evidence that it has attempted to reach any agreement with ERT.[1]  It has not met its burden.

**2.**

Stingray's arguments to the contrary are unavailing.  It primarily asserts that the record is not adequate to support the Commission's condition.  But, as FERC itself noted, "[t]his argument improperly seeks to shift the burden of showing that Stingray's abandonment application is in the public convenience or necessity" to those opposing abandonment without condition.  J.A. 337 & n.38 ("'Abandonment may be allowed only if the "public convenience or necessity permit." And the word "permit," instead of "require," does not shift the burden to those opposing the application.'") (quoting *Mich. Consol.*, 283 F.2d at 214).  The proper inquiry is whether Stingray has established that *unconditional* abandonment is consistent with the public convenience or necessity.  It has not.

*First*, the Commission did not improperly inflate harm to ERT in imposing the condition, nor did it depart from prior precedent.  "The Commission's public interest consideration . . . does not prohibit abandonment if there is any harm to any narrow interest.  Rather, the Commission takes a broad view in abandonment proceedings and evaluates abandonment proposals against the benefits to the market as a whole." *Kinetica Deepwater Express*, 156 FERC ¶ 61,208, slip op., at *3 (Sept. 22, 2016).  Stingray contends that FERC's treatment

---

[1] Stingray has shown it can reach such agreements as to other portions of the system.  With respect to the Mainline Facilities, Stingray volunteered in its amended application that because "the proposed abandonment would eliminate" certain transportation avenues for a firm shipper, Stingray would "reach an agreement with [that shipper] to address the issue of . . . transportation service prior to the proposed abandonment."  J.A. 288.

of ERT as a typical firm shipper was inconsistent with its prior precedent, because ERT's low volume diminished the strength of its interest, rendering it so "narrow" that it did not prohibit abandonment.[2]

In its rehearing request, Stingray cited *Trunkline Gas Co.*, 145 FERC ¶ 61,108 (2013), to argue that ERT's interest is narrow. There, the Commission discussed declining throughput, deeply-discounted rates, and stagnant open seasons as indicative of an "apparent lack of interest by existing and/or potential shippers in contracting for the capacity that Trunkline propose[d] to abandon," which "detract[ed] from the general concerns . . . concerning the negative impact of the abandonment on retail, commercial, and industrial customers within Michigan." *Id.* ¶ 61,573. "Such a lack of interest in obtaining additional capacity on a long-term basis, except at deeply discounted rates, suggest[ed] a belief on the part of the market that alternatives to serve the future needs of Michigan exist." *Id.* But *Trunkline* is distinct from this case because there, "Trunkline ha[d] demonstrated that it will have sufficient capacity following the proposed abandonment to meet its firm shippers' current needs for gas transportation service." *Id.* The same was true in *Kinetica*,

---

[2] Stingray has not forfeited this argument, as FERC suggests. While "[n]o objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission in the application for rehearing unless there is reasonable ground for failure so to do," 16 U.S.C. § 825l(b), Stingray did present this argument below, *see* J.A. 316 (FERC "failed to consider the record evidence specific to the single shipper. Consistent with its precedent, the Commission has found that abandonments are supported when shippers are not willing to obtain firm capacity at maximum rates."). Stingray has also clarified on appeal that it does not challenge ERT's designation as a firm shipper, but rather bases its objection on the circumstances of ERT's contract.

156 FERC ¶ 61,208, at *3. Stingray has neither established that it would supply continuity of service through Segment 3394, as it initially represented, nor has it adduced any evidence as to the value of such service to ERT, *see supra* Section II.A.1. Stingray failed to build a record from which FERC could reach Stingray's preferred conclusion that ERT's interest was "narrow."

In *Delfin*, the Commission conditioned abandonment on the entity's agreement to make the stakeholder "financially whole." *Delfin LNG*, 160 FERC ¶ 61,130, slip op., at *15 (Sept. 28, 2017). Stingray tries to distinguish *Delfin*. It notes that the make-whole condition in that case was justified by evidence that abandonment would change the rates that the stakeholder paid. Here, by contrast, Stingray cites the absence of any evidence of financial impact to ERT. Stingray argues that FERC did not compare the cost to Stingray of the condition with the harm to the shipper of Segment 3394 remaining out of service. Thus, in Stingray's view, FERC did not justify the condition. Pet'r's Opening Br. 38 (arguing that FERC demonstrated "no attempt to justify the costs of placing Segment 3394 in service based on the harm to the single shipper").

Stingray is correct that the Commission noted the absence of affirmative evidence of harm presented by Intervenors. *See* J.A. 287 n.96 ("Although Segment 3394 has been out of service since late 2020, the Producer Coalition does not provide any evidence to demonstrate the challenges Arena, ERT, or any other producer has experienced due to the outage."). But Stingray did not put forth evidence sufficient for FERC to engage in the balancing analysis it urges. The Commission's conclusion that Stingray bore the burden to show the absence of harm was thus consistent with both the statute and prior FERC precedent. *See Gulf S. Pipeline Co.*,

154 FERC ¶ 61,219, slip op., at \*12 (Mar. 17, 2016) (Where the pipeline "fail[s] to satisfy its burden of demonstrating that abandonment will not have a negative impact on its existing firm customers, either economically or in terms of quality of service," FERC properly considers those interests.).

*Second*, the condition was not inconsistent with the Commission's findings. Stingray argues that the same findings that FERC used to justify abandonment as consistent with the public interest counsel against imposition of the challenged condition. But, as the Commission clarified on rehearing, while "certain benefits would attend abandonment[,] . . . that does not undermine the Commission's determination that the condition at issue is appropriate to render abandonment in the public convenience or necessity." J.A. 338. To the extent Stingray asserts that the conditional abandonment is arbitrary and capricious because the whole system's abandonment hinges on a condition limited to one segment, it offers no authority suggesting that such an exercise of FERC's discretion is unreasonable. The Commission enjoys wide discretion in fashioning such orders. *See infra* Section II.B (discussing FERC's authority).

**3.**

Nothing in this decision should be read to endorse a bright-line rule whereby discontinuity of service for any sole firm shipper, irrespective of their particular circumstances, would automatically bar unconditional abandonment. We do not understand FERC's decision to state a rule that abandonment is never in the public interest if a firm shipper loses service, no matter how high the burden to the pipeline or how low the value of service to the shipper. And we recognize that there may very well be cases where a potential shut-in is not dispositive and unconditional abandonment would further

the public interest even if firm service was interrupted. In short, the interests of a firm shipper may not always be coextensive with the public convenience and necessity.

Our ruling today does not wade into these waters, but instead rests on the record that Stingray presented to the agency, which did not adequately explain why unconditional abandonment was consistent with the public convenience and necessity. Because the record is underdeveloped, we do not read the Commission's orders as affirmatively finding that unconditional abandonment would disservice the public convenience and necessity. At oral argument, the Commission acknowledged that Stingray is free to file a new abandonment application that justifies its proposal to abandon Segment 3394 by sale to Triton without first restoring service. Perhaps Stingray will build a more fulsome record and obtain the abandonment order, without condition, that it seeks.

**B.**

We also reject Stingray's arguments that the condition was imposed in excess of FERC's regulatory authority. Congress conferred broad authority upon the Commission to "perform any and all acts, and to prescribe, issue, make, amend, and rescind such orders, rules, and regulations as it may find necessary or appropriate to carry out the provisions of this chapter." 15 U.S.C. § 717o; *see also United Gas Pipe Line Co.*, 385 U.S. at 90 (same). The Supreme Court has "consistently recognized that the Commission's legal control over the continuation of service is a fundamental component of the regulatory scheme. To deprive the Commission of this authority, even in limited circumstances, would conflict with basic policies underlying the Act." *United Gas Pipe Line Co. v. McCombs*, 442 U.S. 529, 538 (1979) (cleaned up). Its discretion encompasses, among other things, the timing of

approval of abandonments. *See Fed. Power Comm'n v. Moss*, 424 U.S. 494, 500–02 (1976) ("In the absence of an explicit direction, the inference may reasonably be made that Congress left the timing of the finding within the general discretionary power granted [to the Commission] 'to regulate the abandonment of service.'") (quoting S. REP. NO. 75-1162, at 2 (1937)).

*First*, Stingray points to no authority supporting its argument that the Commission's conditioning authority is limited to conditions proposed by the parties. One of the reasons that Intervenors opposed abandonment in its entirety was a concern that Segment 3394 would not be restored to service prior to the abandonment order. And while Stingray makes much of the distinctions between Intervenors' request that Stingray not abandon Segment 3394 *in place* and the instant proceedings involving abandonment *by sale*, as the Commission stated, this "places semantics over substance." J.A. 336. The thrust of Intervenors' concern was clearly that service would be shut in as a result of Segment 3394's inactivity, and Stingray does not explain why FERC could not condition abandonment to mitigate that concern.

*Natural Gas Pipeline Co. of America*, 151 FERC ¶ 61,232 (2015), is not to the contrary. Stingray contends that in *Natural Gas*, "the Commission recognized that where the pipeline was in poor condition, there were three options: 1) repair or replace; 2) abandonment in place, which 'would remove facilities from service that might be of use to other market participants'; and 3) abandonment by sale to a third party." Pet'r's Opening Br. 24–25 (quoting *Natural Gas*, 151 FERC ¶ 62,515). But that is not what *Natural Gas* said. In that case, following damage to the pipeline, "[t]his situation prompted Natural"—not FERC—"to evaluate various options with regard to the future operation of Segment 1: (1) repair or

replace Segment 1; (2) abandonment in place; or (3) sale to a third party." 151 FERC ¶ 62,515. The Commission granted abandonment in full, noting that Natural had proposed a new line to ensure continuity of service, *id.* ¶ 62,517 ("Natural states that the proposed new line will be placed in service prior to" disconnect, "thus providing shippers with continuity of natural gas transportation service."), and "the sole firm shipper with a primary delivery point on Segment 1 . . . agreed to terminate their firm transportation agreement," *id.* FERC did not make any statement in *Natural Gas* that abandonment by sale to a non-jurisdictional third party, without first restoring service where such restoration was promised, is proper.

*Second*, the Commission's order does not seek to do indirectly what it cannot do directly, that is, regulate a non-jurisdictional entity. Stingray argues that FERC cannot condition abandonment merely because it would not be able to order the non-jurisdictional entity, Triton, to repair Segment 3394. In support, it cites *National Fuel Gas Supply Corp. v. FERC*, 909 F.2d 1519, 1522 (D.C. Cir. 1990), for the proposition that "[t]he Commission may not, however, when it lacks the power to promote the public interest directly, do so indirectly by attaching a condition to a certificate that is, in unconditional form, already in the public convenience and necessity," Pet'r's Opening Br. 48. But as the Commission made clear in its Rehearing Order distinguishing *National Fuel*, "Stingray's abandonment application is in the public interest *only as conditioned* to ensure that Stingray satisfies its obligations to ERT as a firm shipper." J.A. 342 (emphasis added). Given the record before it, the Commission reasonably concluded that it could approve abandonment only if conditioned on Segment 3394 being repaired or ERT consenting to the segment remaining out of service. *See supra* Section II.A. Moreover, the Commission has "a regulatory responsibility to assure that gas once dedicated to the interstate

market will continue to be available to that market so long as the public interest demands," *United Gas Pipe Line Co.*, 385 U.S. at 88 (quoting *Cont'l Oil Co. v. United Gas Pipe Line Co.*, 31 F.P.C. 1079, 1082 (1964)), and Stingray failed to establish that unconditional abandonment was consistent with the public convenience or necessity.[3]

The Commission's conditional abandonment order did not exceed its authority.

**III.**

For these reasons, we deny the Petition for Review.

*So ordered.*

---

[3] Stingray asserts in passing that the condition impermissibly alters its commercial relationships, but Section 7(b) "creates a continuing regulatory obligation, irrespective of private contractual arrangements, not to abandon any certificated obligations before obtaining authorization from the Commission to do so." *Panhandle E. Pipe Line Co. v. FERC*, 803 F.2d 726, 728 (D.C. Cir. 1986); *McCombs*, 442 U.S. at 538 ("To conclude otherwise . . . would enable private parties to circumvent the Commission's authority over abandonments.").